# In re The Barnes Foundation

C.P. of Montgomery County, no. 58,788.

*Arlin M. Adams,* for the foundation.

*Lawrence Barth, deputy attorney general,* for the Office of Attorney General.

*Terrance A. Kline* and *Paul M. Quinones,* for amicus curiae.

OTT, *J.,* December 13, 2004—In this opinion, we consider the evidence presented at the second round of hearings on The Barnes Foundation's second amended petition to amend its charter and bylaws. In its pleading, the foundation sought permission, inter alia, to increase the number of trustees on its governing board and to relocate the art collection in its gallery in Merion, Pennsyl-

vania, to a new facility in Philadelphia. After the first hearings in December of 2003, we ruled that expanding the size of the board of trustees was appropriate in today's sophisticated world of charitable fundraising. We also determined that the foundation was on the brink of financial collapse, and that the provision in Dr. Barnes' indenture mandating that the gallery be maintained in Merion was not sacrosanct, and could yield under the "doctrine of deviation," provided we were convinced the move to Philadelphia represented the least drastic modification of the indenture that would accomplish the donor's desired ends. We felt that the foundation needed to show more than the adumbration of proposed changes that was presented at the December hearings, and after conferences in camera following the issuance of our January 29, 2004 opinion,[1] the open areas of inquiry were distilled into three questions: (1) Can the foundation raise enough money through the sale of its non-gallery assets to keep the collection in Merion and achieve fiscal stability; and are there ethical and/or legal constraints on such a sale of assets? (2) Can the facility envisioned in Philadelphia be constructed on the proposed $100,000,000 budget? and (3) Is the foundation's three-campus model—the new facility housing the art education and public gallery functions, Merion as the site of the administrative offices and the horticulture program, and Ker-Feal, the Chester County farmhouse on 137+ acres, operating as a living museum—feasible? These issues were addressed at the hearings on September 21,

---

1. 24 Fiduc. Rep.2d 94.

22, 23, 24, 27 and 30, 2004, and generated over 1,200 pages of testimony, a summary of which follows.

On the issue of the value of the foundation's non-gallery holdings for possible sale, the foundation first called two experts to testify about the Chester County real estate known as Ker-Feal. William S. Wood II, a certified general appraiser, performed three separate appraisals at the request of the foundation—one for the farmhouse and outbuildings plus 12 contiguous acres,[2] a second for the other 125 acres of raw land, and the third for the entire property if it were made subject to a land conservation easement. The values he ascribed in his written report were $1,200,000, $4,100,000, and $2,825,000 respectively. (Petitioner's exhibit 68.) He explained that conservation easements preserve open space by restricting development on the subject premises; and he noted that the easements are often sold or donated to municipalities or land conservancies. (N.T. vol. I, 34-35.) Mr. Wood stated that he used the market data approach to arrive at his values. The 125 acres was appraised as raw land, *i.e.*, without taking into consideration its value if the parcel were improved and approved for development. Mr. Wood offered his opinion about the conclusions reached by Kenneth Barrow, a real estate appraiser retained by the students of The Barnes Foundation (who were authorized by the court to act as amicus curiae in

---

2. The point of appraising a hypothetical subdivision consisting of the building plus several acres was to give the court an idea of how much might be raised if only part of the land was sold and the farmhouse kept intact for the foundation's use.

this matter) in his report (discussed at greater length, *infra*). Mr. Wood suggested that Mr. Barrow's view that the 125 acres could be developed into 59 building lots was overly optimistic, and stated that a yield of 40 building lots was more realistic. (N.T. vol. I, 42.)

During cross-examination by counsel for the students, Mr. Wood stated that he would be surprised to learn that the 137 acres had been appraised in 1990 at more than $6,000,000.[3] (N.T. vol. I, 57.)

The second certified general appraiser called by the foundation to give testimony on the value of the Chester County property was Glenn W. Perry. In his report, he appraised the farmhouse plus 12 acres at $1,150,000, the other 125 acres at $3,750,000, and the value of the conservation easement at $2,500,000. (Petitioner's exhibit 67.) Mr. Perry expressed some surprise that his and Mr. Wood's numbers were so close. (N.T. vol. I, 68.)

During cross-examination by counsel for the students, Mr. Perry summarized the steps that must be followed to take raw land through the approval process for development. He testified that the initial process takes between 18 and 30 months, and obtaining subdivision approval takes additional time. (N.T. vol. I, 87-88.)

On the issue of the value of the foundation's tangible property (apart from the items installed in the gallery in

3. The basis for counsel's inquiry was a letter from a realtor with Emlen Wheeler Company that was prepared at the request of the foundation. The letter stated an estimated fair market value of the property, but included no comparables or other indicia of a formal appraisal. The letter was not admitted into evidence.

Merion), testimony was first heard from Elizabeth von Habsburg. She is the president of Masterson Gurr Johns, an international art consulting and appraisal company. After being hired by the foundation, Masterson set about determining the fair market value of 4,532 objects. The objects were grouped into seven categories, specifically, items housed in Ker-Feal; items from another property since sold by the foundation; artwork hanging in the administration building in Merion; Mrs. Barnes' items; Oriental rugs; household objects and decorative arts; and Renoir ceramics. A lump sum fair market value was initially assigned to each category. The reports of the appraised values of the seven groups of objects were introduced as petitioner's exhibit 66. The total appraised value was approximately $14,600,000, the bulk of which was attributable to some of the European and American paintings.

During cross-examination, Ms. von Habsburg stated that the personal property at Ker-Feal was appraised by Masterson's appraisers at $725,209. (N.T. vol. II, 21.) Counsel for the students directed her attention to a document introduced at the December hearings that estimated the value of the collection at $4,000,000. (Petitioner's exhibit 30, p. TBF006394.) Regarding the artwork at Merion that does not hang on the walls of the gallery (referred to as "the non-gallery art") Ms. von Habsburg explained that Masterson appraisers originally set the values after studying digitized images of the pieces. Because the appraisers for the students evaluated 19 of the more valuable works in person, the foundation asked the Masterson appraisers to reappraise the same pieces based on personal inspections. (N.T. vol. II, 25-26, 38.) The

Masterson reappraisals were appended as a supplement to the original reports. (Petitioner's exhibit 66.) The original value of the 19 works was set at approximately $10,000,000. After the personal inspection, the value was determined to be approximately $14,750,000. The higher total was due mostly to the value of one painting, "La Bergère" by Gustave Courbet. When asked if this substantial increase after personal inspection caused her to question the accuracy of the appraisals of the other items, Ms. von Habsburg expressed confidence in the numbers. She explained that Masterson's appraisers had seen 74 percent of the items of tangible property in person. (N.T. vol. I, 41.) Taking into account the revised value for the 19 paintings, the total value of the articles appraised by Masterson was approximately $19,000,000. (N.T. vol. II, 44.)

Upon redirect examination, counsel for the foundation elicited testimony showing that the document contained within petitioner's exhibit 30 which suggested that the collection at Ker-Feal is worth $4,000,000 was a consultant's grant proposal submitted to Lincoln University,[4] and bore no relation to a professional appraisal. (N.T. vol. II, 52.)

The foundation next called Nancy Harrison, the consultant retained by Masterson, to inspect the 19 works

---

4. Lincoln University had the authority under Dr. Barnes' 1952 trust indenture, as amended, to nominate four of the five members of the foundation's board of trustees. This court's January 29, 2004 opinion approved certain amendments to the governing documents vis-à-vis the board's size and nomination process that will change Lincoln's role in the foundation's management in the future.

discussed *supra*. Ms. Harrison stated that she is a generalist in appraising fine arts, with a concentration in the area of 19th century European paintings. (N.T. vol. II, 63.) She explained her methodology for determining the fair market value of works of art, which consists of analyzing the sales of other pieces by the same artists and comparing the attributes of those works (size, condition, etc.) to those of the subject pieces. (N.T. vol. II, 69.) Ms. Harrison stated that Deborah Force, who was retained as an expert by the students, appraised 10[5] of these 19 works, and the two experts' values were very close. (N.T. vol. II, 71.) Ms. Harrison parted company with Richard Feigen, the other appraiser used by the students, on the value of Courbet's "La Bergère." Ms. Harrison appraised this painting at $2,000,000; Mr. Feigen initially determined its value to be $3,500,000, and then raised it to $8,500,000. (Amicus' exhibit 58.)

Ms. Harrison suggested that selling the 19 works she appraised at one time—a "blockbuster Barnes sale" as it were—might yield prices 25 percent to 50 percent higher than her estimated fair market values. However, she explained that a mass sale might have the reverse result due to the "blockage discount," *i.e.,* offering several works by the same artist in the same auction deflates the prices actually obtained. (N.T. vol. II, 76.) Regarding the Courbet painting, Ms. Harrison opined that Mr. Feigen based his revised appraisal (at $8,500,000) on

---

5. Ms. Force provided an appraised value for one work (an illustration by William Glacken) which Ms. Harrison did not appraise. Because Ms. Force's figure for that piece was not high ($15,000), its effect on our analysis is de minimis.

the faulty premise that prices for Courbet's works have risen substantially over the last six years. Ms. Harrison stated that the market has, in fact, been flat. (N.T. vol. II, 79.) She also criticized his use of a current asking price for another Courbet in arriving at his revised number, because a dealer's retail price does not establish fair market value. (N.T. vol. II, 81.)

During redirect by counsel for the foundation, Ms. Harrison explained that Mr. Feigen's factoring in the asking price of that other Courbet runs contra the Uniform Standards of Professional Appraisal Practices, which do not approve using, as comparables, paintings that have never been sold. (N.T. vol. II, 111.)

The foundation's expert witness on the issue of the costs of building a new facility in Philadelphia was Harry Perks, a principal in Perks Reutter Associates. His company manages capital programs. Among the projects on which he has worked are the design and construction of the Kimmel Center in Philadelphia, the renovations of the Academy of Music in Philadelphia, the Primates Project at the Philadelphia Zoo, the renovation of some 50 branches of the Philadelphia Library, and the construction of Campbell Field in Camden. Prior to working at Perks Reutter, Mr. Perks was responsible for the design and construction of Philadelphia's Convention Center and he is currently working on the expansions to that facility. Prior to these jobs, Mr. Perks was streets commissioner for the City of Philadelphia, and before that he was the president of Day and Zimmerman, an international design and construction company. (N.T. vol. II, 126-30.) Mr. Perks was retained by the foundation to evaluate whether $100,000,000 would be sufficient to

build a new home for the foundation in Philadelphia, and to estimate how many square feet could be built at that price. In his report, Mr. Perks concluded that a facility between 120,000 and 150,000 square feet could be built for $60,000,000, or $400 to $500 per square foot. (Petitioner's exhibit 64.) He determined that the facility would incur the following additional costs (other than for construction) totaling $17,000,000: $2.2 million for site preparation, $6.0 million for furniture fixtures and equipment, $1.6 million for a didactic exhibit, and $7.2 million for architectural and other consulting fees. In addition, Mr. Perks estimated that the foundation would spend $1,600,000 to reconfigure the Merion facility to accommodate its new uses ($800,000 for renovation, $650,000 for furniture fixtures and equipment, and $150,000 for architectural fees). The final component of the $100,000,000 would be the $21,400,000 in other costs, consisting of $2,400,000 to relocate the collection, $3,400,000 in administrative costs, and $5,600,000 in "shutdown" costs, and a $10,000,000 contingency fund, to cover miscalculations and revisions in the plans as the project advances.

Mr. Perks explained that, if the instant proposal to move the collection were approved, the next step would be the development of a program and of schematic drawings for the new facility. (N.T. vol. II, 140.)

As part of his report, Mr. Perks analyzed the construction costs for eight museums built around the country within the past 10 years. After making various adjustments, including differences in costs by location and yearly changes in construction costs, Mr. Perks determined that the costs per square foot, projected into 2007

dollars (the contemplated midpoint of construction of the project under consideration) ranged from $375 to $759. (Petitioner's exhibit 64.) Mr. Perks considered these numbers corroborative of his estimate that the new Barnes facility could be built for $400 to $500 per square foot. (N.T. vol. II, 142.)

Mr. Perks was asked to comment on the critique of his analysis that was prepared by a witness for the students. Foremost among the criticisms was the suggestion that Mr. Perks did not have sufficiently detailed estimates on the costs of construction. Mr. Perks indicated that this kind of detail was not necessary for the purposes for which he was retained, and testified that obtaining such information would take time and money (to the tune of one year and one million dollars). (N.T. vol. III, 17-18.)

During cross-examination by counsel for the students, Mr. Perks acknowledged that his company has never overseen the construction of a museum. (N.T. vol. III, 23.) Mr. Perks also agreed with counsel that after a project has advanced to the schematic phase, the normal contingency fund is 15 percent of the budget, rather than the 10 percent factored into the capital cost analysis here under consideration. (N.T. vol. III, 26.) Mr. Perks was questioned about how he factored inflation into his calculations for the projected cost of construction. He acknowledged that the most recent "Engineering News Record" (which had not yet been issued when he prepared his report) shows an increase in inflation over the index he used in preparing his report, and his analysis, if prepared now, would have to be adjusted accordingly. (N.T. vol. III, 31.)

During redirect examination, it was brought out that the proposed facility is not a museum per se, but an educational facility with gallery space, and that Mr. Perks has experience with the construction of approximately 30 schools. (N.T. vol. III, 33.)

The foundation presented evidence on the third issue before us through the testimony of Matthew Schwenderman, a principal with Deloitte Consulting, which is a subsidiary of the Deloitte and Touche accounting firm. Among the services he renders are management consulting to for-profit and not-for-profit organizations in the areas of finance, operations, and management reporting. At Deloitte, he has experience in preparing financial, strategic, cash, and performance management analyses for museums and cultural service organizations. Previously, Mr. Schwenderman worked for the Zoological Society of Philadelphia where he had responsibility, inter alia, for the finance, marketing and development departments. (N.T. vol. III, 78.)

Deloitte was retained to prepare a cash-based, multi-year analysis of the proposed three-campus model for The Barnes Foundation's operations. The parameters of the proposals, as per discussions with Barnes' representatives, were as follows: the gallery in Merion would be recreated within the Philadelphia facility; the art education program would continue to have dedicated hours; there would be expanded hours of operation in Philadelphia; the horticulture education program in Merion and the public access to the grounds there would continue; the gallery building in Merion would be renovated to house the archives, a library and a research center; and Ker-Feal would be developed, as funds were available,

for an educational program and for public access. (N.T. vol. III, 82.) With these directives in mind and after gathering historical data, Deloitte personnel conducted a series of surveys, interviews and financial analyses. The resulting report (petitioner's exhibit 62) projected attendance, income and expense figures for a period covering three years prior to the opening of the Philadelphia facility and three years thereafter. For the year of the move, table 1 of the report projected approximately 16,900 visitors (down from an estimated 68,700 projected for the year before the move) as a result of closing down to effectuate the move. During the opening year, the total number of visitors was projected to be 259,864; and, after the initial burst of interest, the Deloitte report suggested the number of admissions would settle down to approximately 220,760 (consisting of 200,760 general visitors and 20,000 student visitors) for the two succeeding years. There would be corresponding changes in the admissions income, as well as licensing and merchandise income ($58,000 for the year before the move, no income for the year of the move, $180,000 for the opening year, and $150,000 for the next two years) and gallery shop sales ($512,000, $30,000, $1,169,000, and $945,000 respectively). The projections for development, including membership, were $2,393,000 for the year before the move, $1,478,000 for the year of the move, $5,123,000 for the opening year, and $4,250,000 for the two following years. The income from special events— which is presently nonexistent—was projected at $16,000 during the year before the move, $16,000 during the year of the move, $485,000 for the opening year, and $391,000 for each of the next two years. Investment income was

projected to be $2,500,000 per year each year dating from the year of the move into the future, based on the $50,000,000 endowment that the Pew, Lenfest, and Annenberg charities are committed to raising, if the instant proposal is approved.

On the other side of the ledger, drastic changes would also occur in expenses. The report projected salaries, wages and benefits to total $2,226,000 for the second year before the move, $3,873,000 for the year before the move, $4,937,000 for the year of the move, $6,426,000 for the opening year, and $6,001,000 for each of the following two years. Security costs were projected to rise from $417,000 in the year before the move to $961,000 in the year of the move, and to $1,267,000 during the opening year, and to level off at $1,179,000 thereafter. (Table 1 to petitioner's exhibit 62.)

Mr. Schwenderman explained that, of the approximately 200,000 general visitors predicted per year after the opening year has passed, 180,000 would visit the Philadelphia facility and the other 20,000 would be divided between Merion and Ker-Feal. He also stated that this number of visitors at the gallery in Philadelphia was based on 80 percent of that space's estimated capacity and on its being open 42 hours per week to the public. Public hours at the gallery in Merion are currently limited to 24 hours per week. Mr. Schwenderman also stated that, under the projections in the Deloitte report, 27 hours per week at the Philadelphia facility would be dedicated to the art education program, up from the current 24 hours per week at Merion. He explained the projected income from admissions in the Deloitte report is based on a "blended" admission rate of $9, "blended" in that some

visitors would pay less and others would pay more. (N.T. vol. III, 96-98.)

Regarding development income, Mr. Schwenderman listed the sources of same as individuals, corporations, government organizations, and foundations through annual giving, memberships in the Barnes Society, and grants. He stated that the Deloitte report projected income from development to be $4,250,000 or 37 percent of the budget after the opening year. (N.T. vol. IV, 5.) The report shows development income for 2003 and 2004 totaling $3,763,000 and $2,639,000 respectively. Mr. Schwenderman noted that these numbers included the bridge financing supplied by Pew, Lenfest and Annenberg to cover operating costs while the foundation pursues the instant petition. The bottom line, according to Mr. Schwenderman, is that the three-campus model would have modest surpluses each year, based on annual budgets of $12,275,000 for the opening year, and of $11,300,000 for the two years thereafter. (N.T. vol. IV, 8.)

To test the reasonableness of these numbers, Deloitte performed two levels of "benchmarking." One entailed developing a custom survey of financial operations; the other entailed seeking out industry-level data for comparison. The survey was sent to two dozen organizations either with operational models similar to the foundation's or in the Philadelphia area. The survey results on the sources of funding showed that, on the median, these organizations reported that 56.7 percent of their money came from fundraising, 24.3 percent from earned income, and 19 percent from their investments. The industry-wide data broke down these three sources at 52 percent, 33

percent and 16 percent; while Deloitte's projections for the foundation's three-campus model had these percentages at 37 percent, 41 percent and 22 percent respectively. (Table 7 to petitioner's exhibit 62.)

Mr. Schwenderman stated that the accuracy of Deloitte's projections for the foundation's three-campus operation is largely dependent on the accuracy of the attendance projections. (N.T. vol. IV, 14.) He explained that the investment income in the Deloitte model was set at a flat 5 percent draw on the $50,000,000 endowment, for each of the three years covered. (N.T. vol. IV, 17.)

Mr. Schwenderman was asked about the opinion offered by the students' expert, James Abruzzo, that benchmarking is unreliable because the sample used is too small. He stated that benchmarking is appropriate and commonly used to make this kind of preliminary analysis. He explained that benchmarking would not be employed if the goal were to develop a detailed business plan, which would be the next step should the proposal before the court be approved. (N.T. vol. IV, 22.) Regarding Mr. Abruzzo's critique that the Deloitte report was deficient in not factoring in temporary "blockbuster" exhibits that Mr. Abruzzo opined would be necessary at the Philadelphia gallery to keep attendance up (but would lose money), Mr. Schwenderman suggested that any losses would be minimal and that the foundation's collection is sufficiently "blockbuster" on its own. (N.T. vol. IV, 25.) Regarding Mr. Abruzzo's criticism that the Deloitte report does not include any capital replacement costs, Mr. Schwenderman explained that this item was specifically omitted because such projects are often

funded by capital campaigns. (N.T. vol. IV, 27.) Mr. Schwenderman stated that none of Mr. Abruzzo's criticisms changed his opinion about the reasonableness of the projections in the Deloitte report. (N.T. vol. IV, 36.)

During cross-examination, it was brought out that the foundation's actual operating deficit for 2003 was approximately $1.2 million, a figure significantly lower than that projected in the financial analysis performed by Deloitte in 2002 and referred to in the earlier hearings. (Petitioner's exhibit 20; N.T. vol. IV, 46.) Counsel for the students also elicited testimony from Mr. Schwenderman to the effect that the projections for the three-campus model place the fundraising figure at $4,250,000 per year, while the benchmarks for this level of development were institutions with 350,000 visitors per year, a number significantly higher than that projected for the foundation's proposed three sites (220,000). (N.T. vol. IV, 56-57.)

The Deloitte report envisions the programs at Ker-Feal to be at full capacity in the year that the collection is being moved to Philadelphia. Mr. Schwenderman agreed with counsel for the students that the report allocates nothing for capital expenditures at Ker-Feal, and testified that the funds for Ker-Feal would have to be obtained from other sources such as East Pikeland Township, where it is situated. Mr. Schwenderman indicated that he has been advised that the foundation is pursuing restricted grants for Ker-Feal's operations. (N.T. vol. V, 9-10.)

Counsel for the students went through other details of the Deloitte report with Mr. Schwenderman, at-

tempting to show inconsistencies in the numbers and to demonstrate the effects that any deviations between the projections and the actual numbers would have on the finances. Generally, the expert was undeterred and he opined that such deviations would still yield break-even years for the foundation from the opening year forward.

Regarding the foundation's investment income, Mr. Schwenderman clarified that the figure (5 percent) used in the model did *not* represent the rate of interest being earned by the endowment. Rather, as he explained:

"The way the endowment process works is there is an unrestricted endowment of $50 million. The investment committee of an organization establishes what that draw rate should be as a policy and then reviews that policy, if not annually, on a quarterly basis, with their investment managers and with the board [of directors or trustees]. That takes into account a tremendous number of factors: the current market situation regarding investments; whether they're investing for a long-term appreciation, a current income, or a combination; as well as the prospect of generating additional endowment gifts in the future. . . . Using 5 percent, which estimates a long-term approach to managing an endowment from a draw rate, is appropriate. And, in general, if you use long-term indicators of that, that would still, over a 20-, 30-year period, provide somewhere in the 2- to 3-percent growth rate to endowment, as well, which we have not assumed in here because I would not feel it was prudent to assume that the endowment would grow." (N.T. vol. V, 30-31.)

Upon questioning by the court, Mr. Schwenderman expanded on the reasons for the projected large increases in salaries, wages and benefits beginning in the year before the move and explained Deloitte's methodology in assigning the dollar amounts to these expense items. (N.T. vol. V, 46-49; table 1 to petitioner's exhibit 2.)

The next expert witness called by the foundation was John L. Callahan Jr., a consultant in the areas of institutional management, board development and fundraising. His employment history included positions as chief development officer of the American Philosophical Society in Philadelphia and deputy director for external affairs at Winterthur in Delaware. He also worked for 25 years at Amherst College in a variety of capacities. Regarding the question of the foundation's ability to raise the $4.25 million per year called for under Deloitte's projections for the three-campus model, Mr. Callahan stated that this goal is attainable. He made it clear that the board of trustees would have to be aggressive and totally committed. He explained that success would require a clear mission, a clear business plan, a strong marketing plan, and a clear fundraising plan, as well as an exceptional staff to carry these plans out. (N.T. vol. VI, 18-19.) He stated that the board would have to be "very swift out of the blocks," and the management, development and public affairs staffs augmented with individuals with strong expertise in fundraising. He explained the importance of obtaining the support of the heavy-hitters or "alpha donors" to "open minds and hearts" of other donors, and noted that, in this instance, they—Pew, Lenfest and Annenberg—are already in place. (N.T. vol. VI, 21.) He opined that the foundation

could not raise this kind of money were the collection to stay in Merion, in part, because success breeds success, *i.e.,* potential donors are attracted to organizations that are perceived to be thriving, not to ones thought to be foundering. (N.T. vol. VI, 23.)

Under cross-examination by the deputy attorney general, Mr. Callahan expounded on his view that the foundation's fundraising abilities are limited if the gallery remains in Merion, suggesting that negative publicity in recent years might lead potential donors to conclude it is in disarray. On the other hand, he noted that the large amount of press attention to the foundation has drawn attention to the quality of the art collection. (N.T. vol. VI, 26.)

Counsel for the students asked Mr. Callahan if the foundation might enjoy increased success, while still keeping the gallery in Merion, because its board (once it is expanded as per our January 29, 2004 opinion) will be more adept at raising money than the foundation's board has been historically. The witness reiterated the "catch-22" situation referred to by witnesses during the December 2003 hearings, *to wit,* in order to raise the kind of money at issue here, a board must consist of well-connected, highly influential people, and this caliber of individual will not likely be lured onto the foundation's board unless the proposals before the court are approved. (N.T. vol. VI, 37.)

The court asked Mr. Callahan, in light of his testimony that the fundraising requirements under the Deloitte model are hugely ambitious, to comment on the possibility of the foundation's falling short. The witness ac-

knowledged this to be a possibility, and, in such an event, suggested that additional bridge financing could be requested. Beyond this, he declined the court's invitation to offer any "escape routes" should the finances not fall in line as hoped. (N.T. vol. VI, 46.)

The next witness, Edwin L. Wade Ph.D., was called by the foundation to give testimony on the issue of deaccessioning. He is a consultant with expertise in the areas of campaign development, program development, and vision and mission planning for nonprofits. Prior to consulting, he held positions as deputy director of the Museum of Northern Arizona, director of education and curatorial services for the Philbrook Museum of Art in Tulsa, Oklahoma, and assistant director of the Peabody Museum of Archaelogy and Ethnology at Harvard, among others. Dr. Wade currently serves on the education and curatorial advisory committees for the foundation.

Dr. Wade was originally contacted by the foundation to be a guest curator and a collection assessor for the foundation's Native American objects. From his experience with the Native American collection and from reading some of the related archival materials, Dr. Wade determined that Dr. Barnes' interest in the subject was part and parcel of the educational aesthetic to which he was dedicated. (N.T. vol. VI, 61.) He also opined that Dr. Barnes made no distinctions between his works of art that were hanging on the wall at the gallery and those in storage; and that he considered all these objects to be of equal value to his educational process. (N.T. vol. VI, 64.)

The witness identified two sets of ethical guidelines in the museum world—those of the Association of Art Museum Directors (AAMD) and those of the American Association of Museums (AAM). (Petitioner's exhibits 88, 89.) He also identified the Statement of Professional Standards and Ethics of the American Association for State and Local History. (Petitioner's exhibit 90.) On the issue of deaccessioning, the AAM guidelines provide for sales of items in a collection "solely for the advancement of the museum's mission. Proceeds from the sale . . . are to be used consistent with the established standards of the museum's discipline, but in no event shall they be used for anything other than acquisition or direct care of collections." (Petitioner's exhibit 89, p. 9.) In approving of deaccessioning for the purpose of "acquisition," Dr. Wade explained, the guidelines suggest a museum can ethically sell works for the purpose of enhancing its collection. In approving of deaccessioning also to pay for the care of a collection, the AAM parts company with the AAMD, in that the latter organization's code does not recognize this as an appropriate purpose. (N.T. vol. VI, 69.) The AAMD code specifies: "Deaccessioning and disposal by sale shall not serve to provide operating funds. The proceeds from disposal must be treated as acquisition funds." (Petitioner's exhibit 88, p. 22.)

Dr. Wade explained that membership in these museum associations is voluntary, and their ethical standards do not have the force of law; however, members who do not abide by the standards can be removed from the associations. When asked if these ethical standards apply

to the foundation, since it is, at its core, an educational institution, not a museum, Dr. Wade suggested all museums are educational institutions. (N.T. vol. VI, 74.) He also related his own experience, while at the Museum of Northern Arizona, where the decision to sell off a few works to pay general operating costs resulted in rancor, recall of the members of the board, and the serious loss of financial support for the museum. Finally, Dr. Wade opined that the sale of any items in the foundation's collection to create an endowment would cause the organization to be censured and would cause irreparable harm to Dr. Barnes' vision; and that the plan to open a new facility in Philadelphia would meet with the donor's approval. (N.T. vol. VI, 86-87.)

During cross-examination by the deputy attorney general, Dr. Wade noted other downsides to deaccessioning, such as owners' hesitating to donate artwork for fear that the institution will soon dispose of their objects, and potential donors' perceiving that the institution has "excess" pieces that it is selling off, and therefore, doesn't need any more gifts.

In response to questions from counsel for the students, Dr. Wade acknowledged that he did not know if the foundation is a member of the AAMD, and therefore bound by, and subject to censure for running afoul of, its ethical standards. (N.T. vol. VI, 98.) In response to a question from the court, the witness suggested that the foundation is a member of the AAM. (N.T. vol. VI, 111.) Dr. Wade also speculated that, in the museum milieu, the ethical limits on deaccessioning would prevail even in the face of express directions from a donor about liquidating his collection. (N.T. vol. VI, 112.)

The foundation's next witness was Jeremy Sabloff Ph.D., a professor of anthropology at the University of Pennsylvania, who served as director of the university's Museum of Archeology until recently. He described the museum as being an educational institution, as well as a museum. He is currently serving on the foundation's curatorial advisory committee. On the issue of deaccessioning, Dr. Sabloff testified that there is a strong majority opinion among those in the museum community that the proceeds from sales should be used only for the acquisition of other materials or for the direct preservation and care of collections. Dr. Sabloff stated that he has seen the foundation's non-gallery holdings and is of the opinion that these items—particularly the displays at Ker-Feal—mirror Dr. Barnes' vision for educating people in art aesthetics by the use of the ensembles installed in the gallery in Merion. (N.T. vol. VII, 10.) The witness gave his opinion that the ethical standards for museum administration, discussed, *supra,* should apply to the foundation because the art collection is integral to its mission. When asked to choose between two options—the proposed move to Philadelphia or selling assets to raise enough money to keep the gallery in Merion—the witness opined that the first represents the less drastic way to meet the foundation's financial needs while still carrying out its mission. "But," he added, "I say that with reluctance, because I think . . . all things being equal, I'd rather not see either one of those happen." (N.T. vol. VII, 13.)

During cross-examination by counsel for the students, Dr. Sabloff acknowledged that he would prefer a third alternative, that the board of trustees redouble

its fundraising efforts and succeed to such an extent that the gallery can continue where it is. (N.T. vol. VII, 14.)

The next witness was Stephen J. Harmelin, Esquire, who has been a member of the foundation's board of trustees since 2002, and chairs its finance committee. He testified to the bleak financial situation at the foundation during his tenure and the various remedies considered by the board. He echoed the testimony of Dr. Bernard C. Watson Ph.D., president of the foundation, offered during the December 2003 hearings, that the proposal before the court does not constitute a takeover of the foundation's management, as has been suggested by some. (N.T. vol.VII, 40.) Mr. Harmelin also related his conversations with Joseph Manko, the chairman of the Lower Merion Board of Commissioners, wherein they discussed the ramifications of the petition sub judice. Mr. Harmelin testified that he assured Mr. Manko that the horticulture program and perhaps some form of an art program would continue in Merion, even if the gallery does not. (N.T. vol. VII, 44-48.) Mr. Harmelin testified that it remains his opinion that relocating the gallery to Philadelphia is the most appropriate and least drastic solution to the foundation's fiscal crisis. (N.T. vol. VII, 48.)

Under cross-examination by the deputy attorney general, Mr. Harmelin stated that the board of the foundation would install the art and other objects in the exact same ensembles as are currently displayed in Merion, and would keep the art and horticulture education programs intact, if the move to Philadelphia is permitted. (N.T. vol. VII, 50-51.)

In response to questions from counsel for the students, Mr. Harmelin agreed that a "walk-through" museum was anathema to Dr. Barnes, and that his indenture provided for the gallery to be open to the public only one day a week, with the rest of the week devoted to the educational process. (N.T. vol. VII, 62.) Counsel also asked Mr. Harmelin about proposals recently floated in the media for easing the traffic and parking problems attendant at the Merion gallery.[6] Mr. Harmelin suggested, in essence, that the ideas were too nascent and/or speculative to be given serious consideration at this juncture. (N.T. vol. VII, 65.)

The court further explored the state of the foundation's relationship with Lower Merion Township. Mr. Harmelin testified to being disappointed that a resolution passed by the township's board of commissioners to the effect that the board wanted the gallery to remain in Merion, did not lead to the start of a rapprochement. (N.T. vol. VII, 76; amicus' exhibit 94.) When invited to confirm that the foundation's trustees intend to replicate the Merion gallery, if the move to Philadelphia is approved, Mr. Harmelin declined, on the grounds that the plans are inchoate and there can be no such guarantees at present. (N.T. vol. VII, 80.)

Counsel for the students elicited Mr. Harmelin's acknowledgment that, after the favorable resolution was

---

6. It has been suggested, *e.g.,* that, if there were a street and parking lot with direct access to the facility by way of Lancaster Avenue or City Line Avenue, the neighbors' complaints would be eliminated, and the township would allow more visitors, and the revenue from the increased admissions would put the foundation on the road to fiscal wellness.

passed, the foundation took no affirmative action to secure relief from the restrictions placed by the township on the foundation's operations. (N.T. vol. VII, 94.)

The foundation's next witness was Barbara Beaucar, the archives project assistant at the foundation, whose duties include processing and cataloging Dr. Barnes' correspondence. This witness testified about a number of archival documents, and the tenor of her testimony was that all of the foundation's non-gallery holdings, including the collection placed by Dr. Barnes at Ker-Feal and the other objects not hanging in the gallery in Merion, were part of Dr. Barnes' vision for an educational experiment. (N.T. vol. VIII, 30-48.) The witness testified from the foundation's archival documents that the painting by Courbet, which was the subject of much of the expert appraisers' testimony, *supra,* was at one time on display in the Merion gallery. (N.T. vol. III, 50; petitioner's exhibit 80.) She also pointed out several references to non-gallery works in publications written by Dr. Barnes and Violette de Mazia,[7] and showed that the foundation lent out non-gallery works over the years for exhibitions staged by other institutions. (N.T. vol. VIII, 53-62, 64-68.)

Ms. Beaucar read from a letter written in 1923 by Dr. Barnes to his attorney, Owen J. Roberts (later a United States Supreme Court Justice) wherein he said:

"In view of the general belief that I am about to give my life and privacy away to the public—which I never

7. Ms. de Mazia worked with Dr. Barnes, and served as director of education of the art education program at the foundation, for approximately 50 years.

intended—I am afraid of the statement in the affidavit for the Internal Revenue Collector, which reads, 'An art gallery for the education of the public,' and 'the education of the masses in art, etc.' That, of course, is the purpose of the foundation after I am gone, but while I am alive, I do not wish anybody to be able to put their hands on a document bearing such a statement. . . . In short, I am building for the future, I want to guarantee my privacy, and I want to prepare the way for the gallery to be a public one after my death." (Petitioner's exhibit 102.)

Other documents penned by Dr. Barnes demonstrated that he wanted his educational program to be available to schools throughout Pennsylvania and beyond. (Petitioner's exhibits 103, 104, 105, 106.)

Robin McClea, director of education at the foundation, was the next to testify. She stated that the art appreciation and the horticulture education programs, the teaching staff, and the enrollment numbers have all increased since she accepted the position in 1999. She also testified that the foundation recently obtained "approved provider status" (for continuing education purposes for K through 12 teachers) as well as approval of its courses for college credit. (N.T. vol. VIII, 94-98.) Ms. McClea offered this description as to how Ker-Feal and its collection and grounds relate to the educational philosophy employed at Merion as follows:

"Ker-Feal is the site for the study of American decorative arts . . . . It is a collection of American ceramics and pewter, ironwork, furniture, that can be studied aesthetically, the same [way] the gallery collections can be studied. The grounds can be utilized for study in the same

manner that the arboretum in Merion can be utilized by the horticulture program, and offers opportunity for expanded study in horticulture, because of the additional grounds and the opportunities there that the arboretum in Merion does not offer." (N.T. vol. VIII, 100.)

The witness explained that Ker-Feal has, in the past, been used in a very limited manner, but the current board and administration have been working to expand its possibilities. (N.T. vol. VIII, 104-106.)

During cross-examination by counsel for the students, Ms. McClea admitted that there is no reference to Ker-Feal in the foundation's promotional materials, the inference being that Ker-Feal was not an integral part of Dr. Barnes' vision and that the attempts currently to emphasize its importance are solely for the purposes of these proceedings. (N.T. vol. VIII, 115-18; amicus' exhibits 83, 84, 85, 86.)

In response to additional questions by counsel for the foundation, Ms. McClea testified that several of the horticulture and art instructors take their students to Ker-Feal on occasion to study the botanical specimens on the grounds and the collection in the farmhouse. (N.T. vol. VIII, 128.)

The next witness was Marie Malaro LL.B., who was offered by the students[8] as an expert on the ethics of deaccessioning. Professor Malaro worked as counsel for the Smithsonian Institution and ran the graduate program of museum studies at George Washington University for

---

8. The students presented this testimony out of turn, with the court's permission, for the convenience of the witness.

12 years. She helped draft the ethics policy of the AAM, the museum association referred to in earlier testimony. She testified that she has followed the litigation surrounding the foundation for the past 15 years, and has reviewed Dr. Barnes' will and indenture, and the adjudications and orders issued by this court. (N.T. vol. IX, 10, 13.) With this background, she concluded that Dr. Barnes' mission was "quite narrow"—solely to promulgate his unique method of teaching art appreciation in a school format in his gallery in Merion; and she opined that the instant proposal to relocate the gallery to Philadelphia does not comport with that mission. (N.T. vol. IX, 14.) She stated: "a large museum will overwhelm or, at least, put in the background Dr. Barnes' purpose. . . . I find it strange that the trustees are suggesting that they are going to put up a very large traditional museum and then have the gallery in one corner because it will be lost, and also it will put such a burden on the trustees to maintain that building. They won't have much time for Dr. Barnes' core purpose." (N.T. vol. IX, 16.)

Regarding the non-gallery objects, the witness testified that they are not subject to deaccessioning restrictions because the foundation is not a museum; and there is, therefore, no museum mission that forms a framework for making decisions about whether or not the non-gallery items advance the mission and can or cannot be deaccessioned under the ethical guidelines. (N.T. vol. IX, 20, 34.) She emphasized that Dr. Barnes placed restrictions only on the collection hanging in the gallery, which was to remain undisturbed after his death.

During cross-examination by counsel for the foundation, Professor Malaro set forth the definition of

"deaccessioning" as: "the permanent removal of an object that was once accessioned into a museum collection; accordingly, the term does not apply when an object is placed on loan by a museum, nor does it apply if the object in question was never accessioned." (N.T. vol. IX, 57.) The witness reiterated that the objects collected by Dr. Barnes were not accessioned in the technical sense. Counsel pointed out to the witness that Dr. Barnes left Ker-Feal to the foundation in his will, with the direction that it should become a living history museum, and suggested that this made Ker-Feal and its collection subject to the ethical rules against deaccessioning. The witness refused to accept this premise on the grounds that the foundation couldn't accession the property and its contents until the mission and collecting goals of the museum were established, which, the witness suggested, has yet to happen. (N.T. vol. IX, 73.)

The next witness for the foundation was Kimberly Camp, its executive director and chief executive officer. She testified to the importance of Ker-Feal to the overall mission of the foundation. She read Dr. Barnes' correspondence wherein he described the property as: "an historic monument which carries out the pre-Revolutionary spirit and also exemplifies the principles of art and education to which the foundation is devoted. In other words, the central idea [for a proposed article in 'House & Garden' magazine] should be a complete treatment of Ker-Feal in these respects, and sufficient account of the collection of paintings and of trees, plants and shrubs at the foundation proper to supplement and reinforce the significance of Ker-Feal, its purpose, its equipment and its meaning in educational terms." (Petitioner's exhibit 124.)

In another letter to the magazine's staff, Dr. Barnes stated, "Ker-Feal is not our home, but . . . an outgrowth of the educational program of The Barnes Foundation exemplifying the aesthetic principles and educational practices carried out in our gallery at Merion." (Petitioner's exhibit 126.) The article did appear in the December 1942 edition of the magazine, and a copy was introduced into evidence. (Petitioner's exhibit 94.)

Ms. Camp testified that plans are currently under way to lend some of the non-gallery art for a traveling exhibition being assembled by the National Endowment for the Arts, and that grants have been received to fund a catalog to accompany the tour. (N.T. vol. X, 29-30.)

In response to questions from counsel for the students, Ms. Camp confirmed that she is not a member of the AAMD. She noted that the foundation cannot be a member since the association is made up of individuals, not institutions. (N.T. vol. X, 59.)

The court asked the witness about reproducing the gallery in Philadelphia, if the move is authorized. Contrary to Mr. Harmelin's vacillation, Ms. Camp was emphatic that the gallery must be replicated exactly, and the issue is nonnegotiable. (N.T. vol. X, 73.) The court also questioned Ms. Camp about the ambitious proposals regarding hours of operation set forth in the Deloitte model, specifically 42 hours for public visitation and 27 hours for the exclusive use by students. She acknowledged that the foundation envisions an aggressive schedule, including night hours and a seven-days-a-week operation. (N.T. vol. X, 75-77.)

The final witness for the foundation was Dr. Watson, president of the foundation's board. He repeated his state-

ment from the December 2003 hearings that the mayor of Philadelphia has made a public commitment to turning over a site on which a new facility can be built. (N.T. vol. X, 80.) He also reiterated his position that the proposed changes do not constitute a takeover of the foundation's board, and reaffirmed that the proposed relocation of the gallery is the least drastic alternative available to save the organization. (N.T. vol. X, 83-85.)

The foundation's having concluded its case, the students called Debra J. Force, a private art dealer in New York City who has been doing appraisals since her prior employment at Christie's. While at the auction house, she was involved in the 1989 sale of Violette de Mazia's collection by her estate. She also participated in the evaluation of the foundation's permanent collection that was handled by Christie's and Sotheby's in the early 1990s. (N.T. vol. X, 102.) Her specialty is traditional American art, which covers works produced from the late 18th century until 1945. She was retained by the students to evaluate 11 of the most notable works of non-gallery art. She viewed the works in person at the foundation. Thereafter, she sought out comparables and made her evaluations. She appraised the fair market value of the 11 items[9] at $9,665,000. (Amicus' exhibit 53.)

Regarding the present state of the art world, Ms. Force opined that the auction market is doing well, and, if the works she evaluated were offered by Sotheby's or Christie's, they would generate great interest. (N.T. vol. XI, 9.) She discounted the "blockage discount" effect discussed *supra,* because of the quality of the works and

9. See n.5, *supra.*

their provenance. By way of example, Ms. Force noted that several John Singer Sargent paintings from the collection of Mr. and Mrs. John Hay Whitney all commanded seven-figure prices at an auction recently conducted by Sotheby's. (N.T. vol. XI, 13.)

During questioning by counsel for the students, it was brought out that the total for the 11 works appraised by Ms. Force was within 5 percent of the figure reached by Ms. Harrison ($9,665,000 v. $9,065,000). (N.T. vol. XI, 23.)

The students presented a second expert on the art valuation issues, Richard L. Feigen, who is an art dealer, and the director of the Art Dealers Association of America. He explained that members of his association perform appraisals for museums directly and for tax purposes for individuals who are donating items to museums. (N.T. vol. XI, 40-41.) At one time, Mr. Feigen served as a trustee of Lincoln University and, as a result of Lincoln's historical connection to the foundation, came to form and serve on the latter's art advisory board.

Mr. Feigen personally inspected and appraised nine of the foundation's non-gallery paintings and one sculpture. He set the value of the sculpture, a Lipschitz, at $1,600,000. (Amicus' exhibit 57.) He originally determined the total value of the paintings to be $9,320,000. (Amicus' exhibit 56.) He then revised the value of one—Courbet's "La Bergère"—from $3,500,000 to $8,500,000, for a total of $14,320,000, based, in part, on the price currently being asked for another Courbet in Paris.

Under questioning by counsel for the foundation, Mr. Feigen agreed that his primary expertise is not apprais-

ing. He was dismissed from the foundation's art advisory committee in 1991 for his opposition to the petition (filed and withdrawn) by the prior administration seeking court permission to sell paintings from the gallery collection. Mr. Feigen acknowledged describing Dr. Barnes' education program in less than glowing terms ("idiosyncratic" and "anti-art-history") in his book, *Tales from the Art Crypt,* that was published in 2000. After many questions from both counsel for the foundation and from the deputy attorney general concerning the validity of his valuation of the Courbet at $8,500,000, Mr. Feigen suggested that selling that painting in any event would not be appropriate, and that it would be better to sell "two or three of the redundant Renoirs" hanging in the gallery instead. (N.T. vol. XI, 29.)

Joseph Manko, the president of the board of commissioners of Lower Merion Township, was the next witness. He explained that the purpose of the township's January 2004 resolution, discussed *supra,* was "to explain to the public, and I assume that the judge would be able to take judicial notice, that the township wished to have the judge explore all feasible alternatives since it was not the township's intention that the Barnes move to Philadelphia." (N.T. vol. XII, 36.) He stated that the resolution was approved by all 14 commissioners. Mr. Manko spoke of the recent suggestions to alleviate the traffic problems at the Merion gallery, noting that it would take more parties than just the township and the foundation[10]

10. The proposals for improving access to, and parking for, the gallery involve land currently owned by Episcopal Academy that St. Joseph's University is looking to purchase.

to bring them to fruition. (N.T. vol. XII, 41.) Mr. Manko did testify that, should the foundation be directed to keep the gallery in Merion, he would support the trustees' efforts to improve access to the gallery and to enhance the foundation's fundraising abilities. (N.T. vol. XII, 42.)

James Ettelson, another member of Lower Merion's board of commissioners also testified. He represents the ward in which the foundation's Merion property is located. He echoed Mr. Manko's testimony that he would support the foundation in trying to increase public access and fundraising, should the gallery remain in place. (N.T. vol. XII, 62.)

The students next called Kenneth Barrow, a licensed real estate broker and certified general real estate appraiser. He determined the fair market value of the farmhouse and outbuildings, and all 137 acres at Ker-Feal to be $10,300,000. He determined that a seven-acre parcel (rather than the 12 acres used by the foundation's real estate experts for their hypothetical subdivision) would be of sufficient size to support the existing buildings, and appraised this acreage with the buildings at $1,100,000. The remaining $9,200,000 of the total value was premised on the open land's being subdivided into 59 building lots valued at $155,932 each. He based these numbers on the density permitted under the existing zoning ordinances (two-acre lots), the value of existing homes in the area, and the prices being realized for nearby land which is in the process of being subdivided. (N.T. vol. XII, 70-73; amicus' exhibit 60.)

Mr. Barrow explained that his numbers were much higher than those posited by the foundation's real estate

experts because he appraised the property as land available for development, while the other appraisers determined its value as raw land. He stated that it is often the case today that a buyer's offer is made subject to his getting subdivision approval, and the seller accepts with the understanding that the amount he actually receives will be based on the buyer's success, *i.e.,* on a per-lot or per-unit basis. He testified that, in this scenario, the seller sees no money for 18 to 24 months or more. (N.T. vol. XII, 76-77.)

Mr. Barrow was asked to comment about the 1990 estimate of Ker-Feal's value that was referenced during the cross-examination of Mr. Wood, the foundation's real estate expert. Mr. Barrow suggested that this figure ($6,300,000 for the entire property) seemed reasonable, and that land values in the area have risen substantially since then. (N.T. vol. XII, 85.)

In his cross-examination of Mr. Barrow, counsel for the foundation elicited answers that emphasized the payment delay inherent in the subdivision process on which the witness's appraised value was contingent.

The final witness for the students was Paul E. Kelly Jr., the president of a private charitable foundation who pledged, by letter dated September 27, 2004, the sum of $100,000, to be paid over two years to the foundation, conditioned on the gallery's staying in Merion. (Amicus' exhibit 97.)

## DISCUSSION

After careful consideration of this evidence, we find that the foundation met its burden of proof and the sec-

ond amended petition should be granted. Returning to the three areas of inquiry outlined at the beginning of this opinion, we make the following observations. The first issue, as stated above, is as follows:

"(1) Can the foundation raise enough money through the sale of its non-gallery assets to keep the collection in Merion and achieve fiscal stability; and are there ethical and/or legal constraints on such a sale of assets?"

Our conclusion about the latter issue is a negative. We were not convinced by the foundation's experts that museum associations' guidelines should factor into our decision, for three primary reasons. First, the idea that the Merion facility was founded by Dr. Barnes to serve as a school, not a museum, has been the refrain of every party in interest throughout these proceedings. Secondly, regarding the applicability of the ethical precepts to Ker-Feal—the buildings, the land, and the tangible property—Dr. Barnes, in his will, did leave instructions for it to be developed as a living museum of art and botanical garden. However, half a century has passed since his death and the plans for the museum are only now in their infancy. Extrapolating from the testimony of Professor Malaro, it would be nonsensical to determine that the inchoate idea of a museum is prohibited from deaccessioning under ethical guidelines promulgated by museum associations to which it (not in esse) does not belong. Finally, regarding the legality (as opposed to ethics) of selling non-gallery pieces, no party or witness suggested any legal proscription exists.[11]

---

11. This comports with the undersigned's reasoning in the order of May 17, 2001, which approved the foundation's request for permis-

Having determined that the option of selling was available, we next considered the foundation's potential to stay afloat—and at what level—on the funds generated by such sales. Of primary importance, of course, would be the continued existence of the art and horticulture education programs at Merion, and of secondary importance, the public access to the gallery there. Regarding Ker-Feal, the historical evidence convinced us that the farmhouse and the collection contained therein represent a significant opportunity (albeit, unrealized at present) to advance the educational process championed by Dr. Barnes; and, for this reason, the foundation should maintain ownership of the structures and the immediately adjacent land.

We therefore limited our analysis under this scenario to the foundation's liquidating only the non-gallery art[12] and the 125-130 acres surrounding Ker-Feal. Using the estimated values from the foundation's experts, these sales would yield approximately $23,000,000. From this total, it would seem appropriate to subtract the value of the Courbet, on which there was much testimony and, it seems, a consensus, that such an important piece should not be lost to the foundation. Except for the land valuation, the numbers suggested by the students were com-

sion to lend or tour works in storage. We determined therein that the prohibition in Dr. Barnes' indenture against lending or selling applied only to the paintings hanging on the walls of the gallery in Merion. Thus, the ban is irrelevant to our consideration of the land, the buildings, and the collection at Ker-Feal, as well as the other non-gallery items.

12. We refer here to those works that were appraised in person by both sides' experts, and whose values made up the bulk of the total.

parable. Regarding the value of the acreage around Ker-Feal, we are persuaded that the foundation's lower appraisal representing "cash on the barrelhead" for the raw land, not the higher price attainable after it is improved/approved for subdivision, is germane to our inquiry. We conclude that a reasonable expectation of sale proceeds would be about $20,000,000. A 5 percent draw on this would be $1,000,000. History and the evidence presented at these hearings showed this amount would not halt the foundation's downward financial spiral.

As for the prospects of generating additional revenue through development, we credited the opinions of the foundation's witnesses that maintaining the status quo will neither generate excitement among potential benefactors nor attract the all-crucial "alpha donors" to the cause. In the earlier hearings, it was made clear that Pew, Lenfest and Annenberg (all three unquestionably alpha donors) have deemed the current situation to be unsalvageable; and Dr. Watson has testified that the foundation's board has approached all other potential saviors and been rebuffed.

Regarding options for increasing the income produced by the day-to-day operations at Merion, no solid solutions surfaced. The dream of augmented admissions (with the attendant increases in shop sales and parking fees) was shown, during these hearings, to be as elusive as ever. We noted in the January 2004 opinion "this orphans' court has no jurisdiction to broker or impose any changes in the unfortunate situation" between the foundation and Lower Merion Township. See 24 Fiduc. Rep.2d at 110. Since that opinion was issued, all that has changed is that the township passed a conciliatory resolution, and

several other parties (also outside our jurisdiction) have been thrown into the mix, *i.e.,* St. Joseph's University, Episcopal Academy, and possibly the Commonwealth of Pennsylvania (since City Avenue is a state highway). It is also clear that the foundation has no interest in reaching out for the olive branch extended by the township, and absent this first step, no resolution is possible. We have no way to force the foundation's hand in this regard; and we will never know if a mutually-agreeable solution could have been fashioned.

We turn to the second issue at hand, *to wit:*

"(2) Can the facility envisioned in Philadelphia be constructed on the proposed $100,000,000 budget?"

Harry Perks, the foundation's expert on this topic, was well-credentialed, highly experienced, and quite credible. He expressed his opinion that the project is feasible within the requisite degree of professional certainty. He also made clear the nature of his charge—to analyze the foundation's proposal at this preliminary stage—and the myriad of revisions and adjustments that will occur before the doors to a new building can open. As a result of this perspective, under questioning by both counsel for the amicus and by the court, Mr. Perks was essentially unassailable. Therefore, on the budget issue, the foundation met its burden of proof through Mr. Perks' direct and persuasive testimony. In accepting Mr. Perks' conclusions about the soundness of these construction estimates, we do not lose sight of the facts that the cost projections may be too conservative and that changes necessitated thereby may result in a building substantially different in size or amenities.

The third issue, as framed by the court, is as follows:

"(3) Is the foundation's three-campus model—the new facility housing the art education and public gallery functions, Merion as the site of the administrative offices and the horticulture program, and Ker-Feal, operating as a living museum—feasible?"

In this area as well, the foundation presented most impressive witnesses. The articulate and concise testimony of Matthew Schwenderman made the lengthy Deloitte analysis of the three-campus model an excellent roadmap. John Callahan, the expert on development, stated that the foundation can raise the funds needed to make this dream a reality. He emphasized that the foundation's board and staff will have to act quickly, to work assiduously, and to be dedicated absolutely; however, he would not waiver on his opinion that the campaign can succeed. Through the testimony of these two witnesses, the foundation met its burden on this final question before us.

In view of the foregoing, we find that the foundation showed clearly and convincingly the need to deviate from the terms of Dr. Barnes' indenture;[13] and we find that the

---

13. As we have cited many times in the course of the litigation involving the foundation, section 381 of the Restatement (Second) of Trusts states: "[A] court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court that compliance is impossible or illegal or that owing to circumstances not known to the settlor and not anticipated by him, compliance would defeat or substantially impair the accomplishment of the purposes of the trust." It is only the administrative provisions of a trust that are subject to deviation, *i.e.,* "the details of administration which the settlor has prescribed in order to secure the more important result of obtaining for the beneficiaries the advantages which the settlor stated he

three-campus model represents the least drastic modification necessary to preserve the organization. By many interested observers, permitting the gallery to move to Philadelphia will be viewed as an outrageous violation of the donor's trust. However, some of the archival materials introduced at the hearings led us to think otherwise. Contained therein were signals that Dr. Barnes expected the collection to have much greater public exposure after his death. To the court's thinking, these clues make the decision—that there is no viable alternative—easily reconcilable with the law of charitable trusts. When we add this revelation to the foundation's absolute guarantee that Dr. Barnes' primary mission—the formal education programs—will be preserved and, indeed, enhanced as a result of these changes, we can sanction this bold new venture with a clear conscience.

Our conclusion that the foundation should prevail does not mean all doubts about the viability of its plans have been allayed. Of serious concern are its fundraising goals. While Mr. Callahan was on the stand, we commented on his contagious optimism. It is clear the foundation's board will have to catch it. Mr. Callahan was only one of the many witnesses who acknowledged that the foundation is raising the bar enormously above both its own fundraising abilities in the past and those of non-profits in general. "Ambitious" and "aggressive" were among the adjectives we heard to describe the target levels on which the Deloitte report is based. There is a real possibility that the development projections will not be realized,

---

wished them to have." Section 561 of Bogert, *The Law of Trust and Trustees* at 27.

perhaps not in the first few years, but later on, when the interest and excitement about the new venture have faded. If that occurs, or the admissions do not meet expectations, or any of the other components of the Deloitte model do not reach their targets, something will have to give. We will not speculate about the nature of future petitions that might come before this court; however, we are mindful of the vehement protestations, not so long ago, that the foundation would never seek to move the gallery to Philadelphia, and, as a result, nothing could surprise us.

We make a final observation about finances and the plans now being approved. The capital cost analysis prepared by Perks Reutter Associates contemplates renovations to the Merion facility to the tune of $1,600,000. In excess of $12,000,000 was spent upgrading the gallery during the world tour of some of the foundation's works in 1993 and 1994. The irony of converting a state-of-the-art gallery into perhaps the most expensive administration building in the history of non-profits is not lost to us. Looking to the future, it is of the utmost importance that the board of trustees steer the foundation so that another such irony does not surface 10 or 15 years hence.

In light of the foregoing, by separate decree entered eo die, the foundation's second amended petition to amend is granted.

### DECREE SUR SECOND AMENDED PETITION TO AMEND CHARTER AND BYLAWS

And now, December 13, 2004, after continued hearings on the second amended petition of The Barnes Foun-

dation to amend its charter and bylaws, on September 21, 22, 23, 24, 27 and 30, 2004, and after consideration of arguments and briefs of counsel, it is hereby ordered and decreed as follows:

(1) That The Barnes Foundation is granted leave to amend its charter by replacing the current charter with the proposed amended and restated articles of incorporation attached as "exhibit C" to the second amended petition.

(2) That The Barnes Foundation is granted leave to amend its bylaws by replacing the current articles I through X with the provisions set forth as the preamble and articles I through XVII, which are set forth as "exhibit D" to the second amended petition.

(3) That, as provided in the preamble to the amended bylaws, the indenture of Albert C. Barnes shall continue in effect as one of the governing documents of The Barnes Foundation.

(4) That The Barnes Foundation is granted leave to amend its indenture by replacing the current paragraph 6 with the provisions set forth as paragraph 6 of "exhibit E" to the second amended petition.

(5) That The Barnes Foundation is granted leave to amend its indenture by replacing the current paragraphs 17 through 19 with the provisions set forth as paragraphs 17 through 19 of "exhibit E" to the second amended petition.

(6) That The Barnes Foundation is granted leave to amend its indenture by replacing the current paragraph 28 with the provisions set forth as paragraph 28 in "exhibit E" attached to the second amended petition.

(7) That The Barnes Foundation is granted leave to amend its indenture by deleting the provisions in current paragraphs 21 through 25 and 37.

(8) That the foundation itself shall bear the total cost of the technical equipment used during the hearings, as well as the costs incurred by the foundation in making certain paintings available for personal inspection by the students' expert witnesses, on the ground that the students served as amicus curiae to assist the court, and not as a party, per se, in the litigation.